IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

10 SEP 15 PM 12: 32

LAURA A. [illegible]
CLERK

| | | |
|---|---|---|
| COLUMBUS REGIONAL HOSPITAL, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | No. |
| | ) | |
| FEDERAL EMERGENCY MANAGEMENT AGENCY, | ) | **1 : 10-cv- 1 1 0 0 SEB-TAB** |
| | ) | |
| *Defendant.* | ) | |

## COMPLAINT

Plaintiff Columbus Regional Hospital ("Plaintiff" or "CRH") states as follows for its Complaint against Defendant the Federal Emergency Management Agency, ("Defendant" or "FEMA"):

### NATURE OF THE ACTION

1.      This is an action in which CRH seeks to hold FEMA accountable for its failure to comply with Congressional mandates regarding the catastrophic flood of 2008 that devastated south central Indiana and CRH in particular, leaving the Columbus area without many critical emergency and hospital-related services.

2.      As a result of the devastating floods that occurred across Indiana in June 2008, CRH suffered a massive, catastrophic loss. These losses initially crippled its ability to provide much-needed medical services to the surrounding communities. The government declared the area a major disaster area, and FEMA was directed to provide assistance to those who qualified, including CRH. However, FEMA bungled its job. Instead of providing assistance as required by the governing statutes and regulations, FEMA violated those and other statutes.

3.      Among other things, FEMA misapplied and misinterpreted federal law, falsely claiming CRH was seeking a "double recovery" when it knew this was not the case, and CRH

**SCANNED**

demonstrated that this was not the case, several times.  FEMA also refused to reimburse CRH for its purchases of comparable equipment damaged and destroyed in the flood, and implemented a plan that shortchanged CRH by millions.  FEMA hired unqualified employees who claimed CRH was required to find used replacement medical equipment on "E-Bay" that failed to meet CRH's standards (or any applicable medical standards), which would have exposed CRH to liability and delayed the restoration of CRH, at the risk of those Congress ordered FEMA to protect.

4.      The State of Indiana, by its Department of Homeland Security, supported CRH in its cost recovery claims against FEMA, joining in CRH's administrative appeals against FEMA, but FEMA rejected these appeals anyway.

5.      CRH brings this lawsuit to obtain the amounts it is entitled to collect under the applicable statutes and regulations had FEMA properly implemented them, and for all other just and proper relief.

## PARTIES

6.      Plaintiff Columbus Regional Hospital ("CRH") is an Indiana non-profit domestic corporation and a county hospital formed by Bartholomew County to serve the local community and surrounding areas.  CRH is located within the geographic boundaries of Region V of the Federal Emergency Management Agency.

7.      Defendant Federal Emergency Management Agency ("FEMA") is the federal agency designated by the President of the United States to administer the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as Amended and codified in 42 U.S.C. §§ 5121 *et seq.* ("Stafford Act").

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over Defendant pursuant to 28 U.S.C. § 1331, 42 U.S.C. §§ 5121 *et seq.*, 5 U.S.C. §§ 551 *et seq.*, and 5 U.S.C. §§ 701 *et seq.*

9.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b).

## ALLEGATIONS

### COLUMBUS REGIONAL HOSPITAL OR "CRH"

10.     CRH is a county hospital formed by Bartholomew County to serve the local community and surrounding areas, and thus is a branch of Bartholomew County.

11.     A "public entity" in every sense of the word, CRH was a 225-bed facility providing emergency and surgical services, a primary stroke center, chest pain center, lung center, heart center, cancer center, and many other specialty areas.  CRH has received numerous national accreditations, including those for its primary stroke center, chest pain center, digital mammography, and ambulance services.

12.     CRH is not a research and development institution.

13.     In June 2008, CRH was the only hospital in Bartholomew County and the nearest hospital for Indiana residents in the County and surrounding areas.

### THE JUNE 2008 FLOOD

14.     In the summer of 2008, southern Indiana experienced an abnormally high amount of rainfall. On June 7, 2008, the water was too much for the levies of the Haw Creek in Bartholomew County, Indiana, and water surged beyond the borders of the Haw Creek causing extensive flooding throughout Bartholomew County (the "Flood") to businesses, homes, farms, and CRH.

15.     The rising waters entered residential areas where there had never been floods before at such accelerated speeds that there was very little chance for an advance warning to the public of this disaster.

16.     CRH had to evacuate all of its employees and patients from the hospital, as floodwaters entered the hospital.

17.     CRH's basement quickly, and completely, filled with water to the 12-foot ceiling.

18.     Even after the Flood's waters began to recede, the entire first floor of CRH remained submerged under approximately one foot of water and mud.

19.     While the loss of life was minimized, the destruction of public and private property from the Flood was extensive.

20.     Following the Flood, CRH was forced to remain closed for an extended period of time because of power outages, generator failures, and extensive flood damage.

21.     The Flood compromised CRH's electrical systems and caused the hospital to lose power.  Since CRH was the primary location of Bartholomew County's emergency paging system, the loss of power at CRH also caused the Bartholomew County paging system to fail.

### CRH SUFFERS OVER $167 MILLION LOSS FROM THE FLOOD

22.     CRH's basement, which had been completely filled with water from the Flood, had housed the hospital's laboratory, pharmacy, computer systems, kitchen, storeroom, purchasing, central processing, and several other pieces of equipment.

23.     Nothing in the basement was salvageable and several pieces of equipment on the first floor of the hospital were damaged beyond repair.

24.     Key medical equipment irreparably destroyed by the Flood included radiology scanners, radiography and fluoroscopy systems, ultrasounds, cardiac catherization labs, stereotactic biopsy tables, biochemical analyzers and instruments, immunoassay systems.

25.     Besides the loss of obvious instruments, reagents and furniture, CRH also lost many irreplaceable items, including employee records, QC records, CAP binders containing more than ten years of valuable data, training documents, reference books, diplomas, important phone numbers of contacts as well as precious photos.

26.     Initial estimates, based on the severity of the damage to CRH's property, projected that the hospital would be closed for at least a year.

27.     In total, CRH experienced a massive loss totaling approximately $167,151,927, including more than $95 million dollars in property damage and more than $60 million in business income losses.

### THE PRESIDENT DECLARES MAJOR DISASTER AREA AND AUTHORIZES FEMA ASSISTANCE

28.     On June 9, President George W. Bush declared 29 counties in central Indiana, including Bartholomew County, to be a major disaster area, enabling the counties to receive federal aid and Federal Emergency Management Agency ("FEMA") assistance.

29.     Pursuant to 44 C.F.R. 206.44, Governor Mitch Daniels, on behalf of the State of Indiana, executed a FEMA-State Agreement with the FEMA Region V Director, on behalf of FEMA and the United States.

30.     The FEMA-State Agreement applied to the disaster resulting from the Flood and generally provided for public assistance on a 75/25 cost sharing split.

31.     Pursuant to Section 302 of the Stafford Act, 42 U.S.C. § 5143, a Federal Coordinating Officer ("FCO") was appointed.

32.     The State of Indiana assigned Rosemary Petersen and Ralph Lawrence, of the Indiana Department of Homeland Security to be the state public assistance officers responsible for assisting and coordinating the recovery of aid for the victims of the Flood from FEMA. The State of Indiana, by the Department of Homeland Security, joined in CRH's administrative

appeals against FEMA, but FEMA rejected these appeals anyway.

### CRH's Recovery Efforts

33.     As the only critical care facility and breast health center in Bartholomew County, and its service area, CRH needed to resume critical operations such as emergency support, radiology, cardiology and breast health services as soon as possible.

34.     After the Flood, CRH essentially had to re-establish every unit in the hospital and required the hospital to purchase hundreds of pieces of equipment to continue or to resume operations.

35.     CRH's paramount concern was providing 24/7 emergency care to the community, which found itself without a hospital.

36.     Reestablishing emergency operations and a lab in CRH was essential to the reopening of the hospital.

37.     To accomplish this, CRH's staff worked diligently to restore procedure manuals and collaborate with vendors to refurbish a new lab and to replace damaged equipment.

38.     CRH, pursuant to the requirements of its own procurement and safety protocols, worked with its strategic source partners to timely obtain available comparable equipment to replace items destroyed by the flood.

39.     For several weeks following the Flood, many of CRH's employees donned face masks and gloves, picked up mops and scrub brushes, and went to work cleaning up areas affected by the flood.

40.     Workers also pumped water and mud out of the basement and the first floor of the hospital.

41.     Some of CRH's laboratory personnel and office staff worked under a tent next to the hospital where they tried to salvage tissue blocks and slides from pathology.

42.    Histotechnologists and cytotechnologists worked from nearby hospitals and doctor offices.

43.    Pathologists worked from personal trailers.

44.    Chemists and hematologists worked at an outpatient drawing site.

45.    Medical technologists and microbiologists performed the grueling, tedious task of referring and couriering each and every outpatient specimen to a reference lab.

46.    Billing and general hospital management was moved to an airport hangar.

47.    Other employees put their skills to work at other hospitals.

48.    Due to CRH's aggressive response efforts, CRH was able to obtain two 53-foot Med-1 mobile medical units to act as a Level 1 trauma center, complete with surgical capabilities until the hospital could open an interim emergency department on August 1, 2008.

49.    This Interim Emergency Department included a pharmacy and a small lab which operated out of two of the former trauma rooms.

50.    Although CRH resumed emergency services rather quickly, CRH was forced to close its doors for other services like inpatient and surgical services, overnight acute care, intensive care units, and birthing and cancer services for nearly five months, until October 27, 2008.

51.    At that time, the main lab and the mircrobiology darkrooms were set up in temporary locations until a new lab could be constructed and the remaining damage to the hospital could be addressed.

**CRH MAKES CLAIM TO INSURER FOR SPECIFIED LOSSES**

52.    Following the June 2008 flood, CRH obtained the maximum amount available under its insurance policy with the Federal Insurance Company ("Chubb"), the policy limit of $25 million.

53.     The Chubb policy provided a maximum of $25 million in coverage for business income losses, extra expenses, and property damage resulting from a flood.

54.     The Chubb policy specified the available limits for CRH's business income loss and extra expenses sustained as a result of a flood, namely the $25 million policy sublimit applicable to flood losses.

55.     The Building and Personal Property Portion of the Policy also specified that CRH had a coverage limit of "the amount of loss or damage" or "the applicable Limit of Insurance ...."

56.     In August 2008, CRH requested payment of its entire policy limit for certain specified expenses that the hospital had incurred to date in responding to the Flood.  The costs that CRH requested Chubb to pay included: 1) "business income losses" for payroll expenses incurred as a result of the June 2008 flood; 2) costs from "Paul Davis National and BMS Cat, Inc. for emergency restoration services"; and 3) McCarthy Building Companies costs "for initial general rebuilding and restoration contracting services."

57.     In August 2008, Chubb issued a payment of $25,000,000 to CRH for its Flood losses.

58.     On September 18, 2008, CRH informed FEMA of the payment from Chubb and explained in detail what specific bills were paid with the insurance check from Chubb.

59.     CRH did not seek to recover these insurance-paid expenses from FEMA.

60.     FEMA did not make any objection to CRH's request to allocate its insurance money to the bills specified in CRH's September 2008 letter.

61.     Later, on April 6, 2009, CRH and FEMA met to discuss issues related to CRH's actual losses and the allocation of CRH's insurance proceeds.

62.     During this meeting, CRH reiterated to FEMA that it was not seeking duplicative benefits from FEMA and that the hospital's insurance proceeds were used to reimburse actual bills and expenses, bills and expenses CRH was not asking FEMA to reimburse.

63.     FEMA took the position that CRH's eligible reimbursements must be cut by sixty-four percent (64%), or $15,913,492.64 , because of the Chubb payment.

64.     FEMA has wrongfully sought to justify this additional $15,913,492.64 cut in aid by claiming that CRH improperly sought a "duplication of benefits" for its flood losses in contradiction to 42 U.S.C. § 5155 of the Stafford Act and FEMA's Disaster Assistance Fact Sheet 9508.3.

65.     FEMA took this position even though it knew better, and despite the undisputed evidence from CRH that: a) CRH had already expended Chubb's payment on other necessary and legitimate expenses resulting from the June 2008 flood, b) CRH did not seek reimbursement from FEMA for the bills it had already paid with Chubb's reimbursement, only FEMA-eligible expenses that had not yet been reimbursed, and c) CRH had suffered massive FEMA-ineligible business interruption losses that far exceeded the available insurance coverage.

66.     Beginning on April 30, 2009, through May 27, 2009, FEMA reduced aid provided to CRH by $15,913,492.64 for expenses addressed in the following fifty-six PWS:  MJR-001, KDW-035, KDW-045, CEE-014, KDW-016, MJR-020, CEE-015, MMB-028, KDW-025, KDW-027, KDW-031, KDW-015, KDW-017, KDW-014, GTM-062, GTM-058, GTM-053, GTM-069, GTM-065, GTM-072, GTM-057, GTM-085, GTM-071, GTM-070, GTM-078, MMB-021, MDF-074, MDF-067, MDF-060, KDW-032, KDW-030, MMB-003, KDW-038, KDW-048, KDW-049, MDF-068, KDW-043, MMB-016, KDW-040, BDS-025, MDF-083, MDF-087, WCM-044, KDW-028, MDF-090, BDS-033, MDF-084, GTM-076, MDF-086, MMB-026, MDF-098, MDF-079, MMB-034, MDF-093, BDS-026, MMB-020, and MMB-021.

67.     Although CRH had already spent its insurance money on items reported to FEMA, FEMA ignored these expenditures and issued the fifty-six (56) PWs assuming a hypothetical — and incorrect — allocation of the $25 million policy limit payment from Chubb.

### CRH TIMELY EXHAUSTED ITS APPEALS RELATING TO INSURANCE

68.     The deadline for CRH to appeal these PWs ranged from June 30th to July 27, 2009.

69.     On June 30, 2009, pursuant to 44 CFR § 206.206, CRH timely appealed FEMA's decision to cut the reimbursement to CRH by $15,913,492.64 based on a hypothetical allocation of CRH's insurance recovery between its business income losses and FEMA-eligible property losses ("First Insurance Appeal").

70.     The State of Indiana and its Department of Homeland Security joined in this appeal.

71.     By letter dated November 5, 2009, FEMA-Region V responded to and summarily rejected the First Insurance Appeal, stating that because CRH's insurance policy did not specify limits for business income losses as well as FEMA-eligible property losses, FEMA had properly allocated CRH's insurance policy proportionally between CRH's business income and property losses.

72.     On December 30, 2009, CRH filed its second level appeal of FEMA's July 7, 2009, determination to cut aid to CRH in these fifty-six (56) PWs based on CRH's insurance recovery.

73.     The State of Indiana and its Department of Homeland Security again joined in this appeal.

74.     On May 12, 2010, Elizabeth A. Zimmerman, Assistant Administrator Recovery Directorate for FEMA, issued a letter informing CRH that FEMA was denying CRH's second

appeal because FEMA had concluded that the insurance policy could not be fully allocated to business income losses. This decision did not address the fact that the insurance proceeds were spent on expenses that had not been sought from FEMA and to which FEMA had initially not objected.

75.     The May 12, 2010 determination letter stated that it was FEMA's final decision on this matter pursuant to 44 CFR §206.206, Appeals.

### REPLACEMENT OF IRREPARABLY DAMAGED MEDICAL EQUIPMENT

76.     On September 25, 2008, CRH met with FEMA representatives as well as officials from the State of Indiana to discuss, among other things, the hospital's costs in procuring replacement equipment for the equipment irreparably damaged in the June flood.

77.     Present on FEMA's behalf was Stacie Grathen, FEMA Public Assistance Branch Director and Steve Deblassio, FEMA's State of Indiana Federal Coordinating Officer ("FCO").

78.     Also in attendance were was Bruce Smith, Larry Bailey, and Eric Shults on behalf of the Indiana Department of Homeland Security ("DHS").

79.     During the meeting, Steve Deblassio, FEMA's FCO, stated that if CRH "follow[ed] their own established procurement procedures in replacing equipment, there would be no issues of procurement to overcome at a later date."

80.     CRH noted that it had used, and was continuing to use, its normal procurement procedures, and was getting estimates for repair of equipment when feasible.

81.     CRH's procurement standards include compliance with the Medical Equipment Management plan requirements of the Healthcare Facilities Accreditation Program ("HFAP"), which provides CRH's accreditation.

82.     HFAP's equipment management standards required CRH to utilize risk assessment tools for the selection and acquisition of medical equipment that include: 1) a

process for acquisition of medical equipment from a reliable source that can certify its fitness for use in the intended purpose and provide service and warranty information on the equipment; and 2) have processes and procedures in place for effective product recall systems.

83.     Effective product recall notification from an equipment manufacturer cannot be obtained when equipment is purchased from a non-certified third-party vendor.

84.     The September 2008 meeting with FEMA, and the issues discussed, was memorialized in a September 26, 2008, letter that was sent to FEMA for confirmation and comment.

85.     FEMA did not make any changes or corrections to the meeting summary.

86.     After the September 2008 meeting, CRH was instructed by FEMA personnel that it was required to replace its equipment with used or "refurbished" equipment regardless of any CRH procurement policy prohibiting such purchases.

87.     FEMA calculated the replacement costs for certain medical equipment irreparably damaged in the Flood in nine (9) Project Worksheets ("PWs") obligated by FEMA on April 9, 2009 (MDF-066, MDF-077); April 10, 2009 (MDF-065, MDF-078, MDF-073, MDF-062, MDF-068); and  April 16, 2009 (MDF-074, MDF-076).

88.     All of the medical equipment irreparably damaged and discussed in these nine (9) PWs was "equipment" for purposes of 44 CFR §13.3, which defines "equipment" as "tangible, non-expendable, personal property having a useful life of more than one year and an acquisition cost of $5,000 or more per unit. A grantee may use its own definition of equipment provided that such definition would at least include all equipment defined above."

89.     These nine (9) PWs calculated the cost for CRH to replace its destroyed medical equipment with used or refurbished equipment at $2,496,598.94, even though the actual cost to replace the damaged equipment with "comparable equipment" that was safe, complied with

CRH's procurement policies, and was timely available, was estimated to cost $3,700,173.83.

90.     As written by FEMA, the PWs calculated the replacement cost for the damaged medical equipment to be $2,496,598.94, on the assumption that CRH must replace its damaged equipment with used or "refurbished" equipment and that used equipment was reasonably and timely available.

91.     In most cases, refurbished or used equipment was not a viable replacement option because CRH could not obtain any warranty that such equipment would properly interface with CRH's patient registration and records management systems and because refurbished equipment would not have been available for several months.

92.     Moreover, the PWs, as written, did not fully compensate CRH for the full replacement cost of all its equipment, regardless which valuation standard was applied.

93.     The equipment at issue included radiology scanners, ultrasounds, diagnostic equipment, cardiac lab equipment, catherization equipment for cardiac procedures, equipment necessary for biopsy procedures, such as breast health biopsies, and others. Most, if not all, of the equipment was used daily by CRH in providing its lab, emergency and diagnostic services.

### CRH Timely Exhausted Its Appeals Relating To Equipment

94.     The deadline for CRH to appeal these PWs ranged from June 8th to June 15, 2009.

95.     On June 8, 2009, pursuant to 44 CFR § 206.206, CRH timely appealed FEMA's decision not to reimburse the full costs incurred to replace the medical equipment destroyed in the Flood at issue in PWs MDF-066, MDF-077, MDF-065, MDF-078, MDF-073, MDF-062, MDF-068, MDF-074, and MDF-076.

96.     This First Appeal noted that FEMA's determinations for the nine PWs at issue were in error because: 1) the determinations required CRH to replace the destroyed equipment

with "refurbished" equipment that could not safely and reliably be used in a health care facility and was not comparable to the destroyed equipment; 2) the refurbished equipment FEMA selected would not have been reasonably available to timely and adequately meet CRH's needs; and 3) the PWs did not even reimburse CRH for the full cost of the "quoted" refurbished equipment.

97.     Again, the State of Indiana and its Department of Homeland Security joined in this appeal.

98.     By letter dated July 7, 2009, received by CRH on August 7, 2009, FEMA-Region V responded to and summarily rejected the First Appeal, stating that "[t]he value of the destroyed equipment was established by FEMA based on the fair market value of equipment of similar age and capacity" and FEMA will only "approve the replacement of the item with a similar item of approximately the same age, capacity and condition."

99.     On September 4, 2009, CRH filed its second level appeal of FEMA's July 7, 2009, determination for these nine (9) PWs with FEMA.   The State of Indiana and the Department of Homeland Security joined in this appeal.

100.    On May 12, 2010, Elizabeth  A. Zimmerman, Assistant Administrator Recovery Directorate for FEMA, issued a letter informing CRH that FEMA was denying the second appeal because FEMA staff had staff appropriately estimated the cost of the PWs at the lowest quoted cost for replacement of the damaged equipment and that the replacement of the damaged equipment with refurbished equipment was appropriate.

101.    The May 12, 2010 determination letter stated that it was FEMA's final decision on this matter pursuant to 44 CFR §206.206, Appeals.

102.    All conditions precedent to this action have been satisfied.

14

103.    CRH is entitled to all appropriate legal and equitable relief, and gives notice that it seeks this relief under all available statutes, regulations, and common law, including the specific claims and causes of action outlined below.

**COUNT I**
**VIOLATIONS OF STAFFORD ACT AND REGULATIONS — INSURANCE**

104.    The allegations of paragraphs 1 through 103 are incorporated by reference into this Count I and made a part hereof.

105.    CRH meets the eligibility requirements for receiving FEMA Assistance and has performed all required conditions precedent necessary to receive such Assistance.

106.    The Stafford Act provides that "Receipt of partial benefits for a major disaster or emergency shall not preclude provision or additional Federal assistance for any part of a loss or need for which benefits have not been provided." 42 U.S.C. § 5155 (b)(3).

107.    FEMA violated the Stafford Act and accompanying regulations by improperly and fictitiously allocating a payment CRH received from its insurer to items that the insurance payment was not applied.

108.    FEMA's violations resulted in cutting CRH's eligible reimbursements by sixty-four percent (64%), or $15,913,492.64.

109.    CRH has suffered harm as a result of FEMA's violations.

**WHEREFORE**, Plaintiff respectfully request that the Court enter a judgment in the amount of all damages incurred by Plaintiff and not less than $15,913,492.64, plus interest, for the costs of this action, and for all other appropriate relief.

## COUNT II
## VIOLATIONS OF STAFFORD ACT AND REGULATIONS — EQUIPMENT

110.     The allegations of paragraphs 1 through 109 are incorporated by reference into this Count II and made a part hereof.

111.     CRH meets the eligibility requirements for receiving FEMA Assistance and has performed all required conditions precedent necessary to receive such Assistance.

112.     Section 206.226(h) of the Code of Federal Regulations provides as follows: "Equipment and Furnishings.    If equipment and furnishings are damaged beyond repair, comparable items are eligible as replacement items." *See*, 44 C.F.R. §206.226(h).

113.     FEMA violated the Stafford Act and accompanying regulations by failing to provide reimbursement for "comparable" medical equipment that was irreparably damaged in the Flood.

114.     Moreover, prior to CRH's purchase of comparable equipment, FEMA was aware that CRH planned to buy the comparable equipment and did not object to these purchases before or at the time they were made.

115.     As a result of FEMA's violations, CRH has suffered harm in that it should have received an additional $1,203,574.89 for comparable medical equipment from FEMA, exclusive of interest.

**WHEREFORE**, Plaintiff respectfully request that the Court enter a judgment in the amount of all damages incurred by Plaintiff and not less than $1,203,574.89, plus interest, for the costs of this action, and for all other appropriate relief.

## COUNT III
### VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT — INSURANCE

116.   The allegations of paragraphs 1 through 115 are incorporated by reference into this Count III and made a part hereof.

117.   FEMA's improper and fictitious allocation of CRH's insurance payment has the effect of creating a new administrative rule or regulation.

118.   Such a new administrative rule or regulation was not promulgated in accordance with the Administrative Procedure Act (the "APA").

119.   FEMA has engaged in rulemaking in violation of the APA by allocating the insurance payment in a manner that violates the Stafford Act and that contradicts the facts of this case (*i.e.*, how the insurance payment was actually spent).

120.   FEMA arbitrarily and capriciously engaged in rulemaking in violation of the APA by improperly and fictitiously allocating CRH's insurer's payment.

121.   FEMA has abused its discretion by improperly and fictitiously allocating CRH's insurer's payment.

122.   FEMA does not have the legal power or privilege to engage in rulemaking in violation of the APA.

123.   In improperly and fictitiously allocating CRH's insurer's payment, FEMA acted without the observance of procedure required by law.

124.   FEMA has exceeded its statutory jurisdiction, authority, and limitations by improperly and fictitiously allocating CRH's insurer's payment in violation of the Stafford Act and Regulations.

125.   FEMA's violations resulted in cutting CRH's eligible reimbursements by sixty-four percent (64%), or $15,913,492.64.

**WHEREFORE**, Plaintiff respectfully request that the Court enjoin FEMA from cutting the amount of CRH's aid, and find that CRH is entitled to recover not less than $15,913,492.64, plus interest, for the costs of this action, and for all other appropriate relief.

## COUNT IV
## VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT — EQUIPMENT

126.    The allegations of paragraphs 1 through 125 are incorporated by reference into this Count IV and made a part hereof.

127.    FEMA's violations of the Stafford Act and regulations, including 44 C.F.R. §206.226(h), by failing to provide reimbursement for "comparable" medical equipment to CRH has the effect of creating a new administrative rule or regulation.

128.    Such a new administrative rule or regulation was not promulgated in accordance with the APA.

129.    FEMA has engaged in rulemaking in violation of the APA by failing to provide reimbursement for comparable medical equipment in a manner that violates the Stafford Act and regulations.

130.    In failing to provide reimbursement for comparable equipment, and in failing to object with adequate notice of the purchase of the comparable equipment, FEMA arbitrarily and capriciously engaged in rulemaking in violation of the APA.

131.    FEMA has abused its discretion by failing to provide reimbursement for comparable equipment and in failing to object after receiving adequate notice of the purchase of such equipment.

132.    FEMA does not have the legal power or privilege to engage in rulemaking in violation of the APA.

133.     In by failing to provide reimbursement for comparable equipment and in failing to object after receiving adequate notice of the purchase of such equipment, FEMA acted without the observance of procedure required by law.

134.     FEMA has exceeded its statutory jurisdiction, authority, and limitations by failing to provide reimbursement for comparable equipment and in failing to object after receiving adequate notice of the purchase of such equipment in violation of the Stafford Act and regulations.

135.     As a result of FEMA's violations, CRH has suffered harm in that it should have received an additional $1,203,574.89 for comparable medical equipment from FEMA, exclusive of interest.

**WHEREFORE**, Plaintiff respectfully requests that the Court enjoin FEMA from requiring CRH to use procedures to replace its damaged equipment that do not comply with CRH's procurement procedures and policies, and order that CRH is entitled to recover all damages actually incurred by Plaintiff to properly replace its damaged equipment, in an amount not less than $1,203,574.89, plus interest, and for all other appropriate relief.

**COUNT V**
**FEDERAL TORT CLAIMS ACT — NEGLIGENCE (INSURANCE)**

136.     The allegations of paragraphs 1 through 135 are incorporated by reference into this Count V and made a part hereof.

137.     CRH timely presented its claims to the appropriate federal agency, FEMA, for the massive damages it suffered as a result of the Flood.

138.     FEMA issued its final agency decision regarding CRH's claims and appeals on or about June 12, 2010.

139.    FEMA's planned course of action included reimbursement to CRH for certain eligible losses, not relating to business income losses, that CRH incurred as a result of the Flood.

140.    FEMA employees negligently implemented FEMA's planned course of action by improperly and fictitiously allocating a payment CRH received from its insurer.

141.    FEMA's conduct resulted in cutting CRH's eligible reimbursements by sixty-four percent (64%), or by some $15,913,492.64.

**WHEREFORE**, Plaintiff respectfully request that the Court enter a judgment in the amount of all damages incurred by Plaintiff and not less than $15,913,492.64, plus interest, for the costs of this action, and for all other appropriate relief.

### COUNT VI
### FEDERAL TORT CLAIMS ACT — NEGLIGENCE (EQUIPMENT)

142.    The allegations of paragraphs 1 through 141 are incorporated by reference into this Count VI and made a part hereof.

143.    CRH timely presented its claims to the appropriate federal agency, FEMA, for the massive damages it suffered as a result of the Flood.

144.    FEMA issued its final agency decision regarding CRH's claims and appeals on or about June 12, 2010.

145.    FEMA's planned course of action included reimbursement to CRH for the purchase of comparable equipment to certain CRH equipment that was irreparably damaged as a result of the Flood.

146.    FEMA hired several employees to implement its plan of action. None of these FEMA employees were medical professionals knowledgeable about medical standards of care relating to the use of such equipment; nor were the employees experienced in purchasing medical equipment. In point of fact, these FEMA employees had no prior experience in the medical field at all and did not possess any experience specifically relating to medical equipment.

147.   FEMA's employees negligently implemented FEMA's plan by failing to reimburse CRH for comparable equipment.

148.   FEMA's employees negligently implemented FEMA's plan by erroneously relying on values of non-comparable equipment in its calculations that did not comply with CRH's procurement procedures or usual and customary medical standards.

149.   FEMA employees negligently implemented FEMA's planned course of action by calculating its reimbursement of "comparable" equipment with the values of non-comparable equipment that did not have warranties.   Indeed, these employees attempted to calculate the replacement costs for CRH's damaged equipment by finding equipment located on websites, such as "EBay," where neither the equipment nor the seller could be verified as reputable.

150.   As a result of FEMA's conduct, CRH has suffered harm in that it should have received an additional $1,203,574.89 for comparable medical equipment from FEMA, exclusive of interest.

**WHEREFORE**, Plaintiff respectfully request that the Court enter a judgment in the amount of all damages incurred by Plaintiff and not less than $1,203,574.89, plus interest, for the costs of this action, and for all other appropriate relief.

## COUNT VII
### FEDERAL TORT CLAIMS ACT — MISREPRESENTATION

151.   The allegations of paragraphs 1 through 150 are incorporated by reference into this Count VII and made a part hereof.

152.   CRH timely presented its claims to the appropriate federal agency, FEMA, for the massive damages it suffered as a result of the Flood.

153.   FEMA issued its final agency decision regarding CRH's claims and appeals on or about June 12, 2010.

154.    FEMA's planned course of action included reimbursement to CRH for the purchase of comparable equipment to certain CRH equipment that was irreparably damaged as a result of the Flood.

155.    FEMA hired several employees to implement its plan of action.  None of FEMA's employees were medical professionals knowledgeable about medical standards of care relating to the use of such equipment; nor were these employees experienced in purchasing medical equipment.  In fact, these FEMA employees had no prior experience in the medical field and did not possess any experience specifically relating to medical equipment.

156.    CRH gave adequate and timely notice to FEMA regarding its plan to purchase comparable medical equipment.

157.    FEMA's employees misrepresented to CRH that equipment purchased by CRH according to CRH's regular purchasing methods and equipment standards would be accepted by and reimbursed by FEMA.

158.    CRH reasonably relied upon the representations made by the FEMA employees.

159.    FEMA then failed to reimburse CRH for the comparable equipment it purchased, and claimed that other equipment should be considered "comparable" to the damaged equipment that CRH replaced.

160.    FEMA employees calculated its reimbursement of "comparable" equipment with the values of non-comparable equipment that failed to meet CRH's procurement policies or usual and customary medical standards.

161.    FEMA employees calculated its reimbursement of "comparable" equipment with the values of non-comparable equipment that did not have warranties.  Indeed, these employees attempted to calculate the replacement costs for CRH's damaged equipment by finding equipment located on websites, such as "EBay."

162.   As a result of FEMA's conduct, CRH has suffered harm in that it should have received an additional $1,203,574.89 for comparable medical equipment from FEMA, exclusive of interest.

**WHEREFORE**, Plaintiff respectfully request that the Court enter a judgment in the amount of all damages incurred by Plaintiff and not less than $1,203,574.89, plus interest, for the costs of this action, and for all other appropriate relief.

**COUNT VIII**
**VIOLATION OF THE DUE PROCESS CLAUSE**
**OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

163.   The allegations of paragraphs 1 through 162 are incorporated by reference into this Count VIII and made a part hereof.

164.   CRH has a property interest in the ability to claim and make use of FEMA Assistance available under the Stafford Act and the federal regulations.

165.   The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits FEMA from employing procedures that are not reasonably designed to prevent arbitrary or erroneous delays or determinations with respect to claims for FEMA Assistance, and from depriving CRH of a meaningful opportunity to seek and make use of those benefits.

166.   FEMA has subjected CRH to arbitrary and erroneous determinations by both improperly and fictitiously allocating an insurance payment received by CRH's insurer, as well as by failing to reimburse CRH for the purchase of comparable medical equipment to equipment that was lost or irreparably damaged in the Flood.

167.   FEMA's conduct amounts to a deprivation of a property interest without notice and due process and demonstrates that FEMA does not have procedures in place that are reasonably designed to prevent arbitrary and erroneous benefit delays and determinations.

168.    As a result, FEMA has violated CRH's rights under Due Process of law as guaranteed by the Fifth Amendment to the United States Constitution.

**WHEREFORE**, Plaintiff, Columbus Regional Hospital respectfully requests that the Court enter a declaratory judgment in its favor and against Defendant FEMA, and award damages and all other appropriate relief.

## COUNT IX
## DECLARATORY JUDGMENT

169.    The allegations of paragraphs 1 through 168 are incorporated by reference into this Count IX and made a part hereof.

170.    CRH has a protectable interest in receiving FEMA aid.

171.    Among other things, CRH is entitled to reimbursement of its purchases of comparable medical equipment to replace the medical equipment that was irreparably damaged in the flood, and CRH was shortchanged because FEMA improperly and fictitiously allocated the insurance payment CRH received from its insurer in a manner that was contrary to the facts and applicable law.

172.    FEMA has opposed CRH's interest in full and proper reimbursement in denying all timely-filed appeals.

173.    There is an actual, justiciable controversy between CRH, on the one hand, and FEMA, on the other hand, regarding CRH's rights and obligations with respect to the aid provided by FEMA.

174.    FEMA could fulfill its obligations under the applicable statutes and regulations, but it instead has violated them through its definite and unequivocal conduct.

175.    CRH is entitled to a declaratory judgment that FEMA is obligated to reimburse CRH for its purchases of comparable medical equipment to replace the irreparably damaged

medical equipment, as well as the payment it would have received from FEMA had FEMA not improperly and fictitiously allocated the insurance payment CRH received from its insurer.

176.    FEMA has failed to properly reimburse CRH, and its breaches of its obligations continue to this day.

**WHEREFORE**, Plaintiff, Columbus Regional Hospital respectfully requests all appropriate legal and equitable relief in this matter, including:

a.    A declaratory judgment that Defendant FEMA is obligated to reimburse CRH fully for damaged medical equipment, and not improperly misallocate the insurance payment of CRH, such that FEMA will pay CRH an additional $17,117,067.53, plus interest;

b.    An order prohibiting FEMA from using CRH's insurance recovery to reduce aid or assistance recoverable from FEMA;

c.    An order prohibiting FEMA from requiring CRH to use procedures to replace its damage equipment that do not comply with CRH's procurement procedures and policies;

d.    An award of CRH's costs, attorneys fees, and litigation expenses in this action, and

e.    Any and all other relief that this Court may deem appropriate.

Respectfully submitted,

_____

Brent W. Huber (Atty. No. 16077-53)
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN 46282
Telephone: (317) 236-2100
Facsimile: (317) 236-2219
E-mail: brent.huber@icemiller.com

*Attorney for Plaintiff Columbus Regional Hospital*

I/2523232.1